# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| ADRIAN LOCKLEY, | * | |
| | * | |
| v. | * | Civil No. JFM-14-825 |
| | * | |
| TOWN OF BERWYN HEIGHTS | * | |
| | * | |
| | ****** | |

## MEMORANDUM

Plaintiff Adrian Lockley brings suit against his employer, the Town of Berwyn Heights, Maryland ("the Town"). Lockley has been employed by the Town's Public Works department since 2007 in a variety of roles; presently he serves as Director. Lockley is African-American, and in his complaint he alleges that the Town discriminated against him by failing to compensate him at an appropriate level and for failing to permit him to become Director, rather than Acting Director, of the Department for a two year period. Lockley has brought claims for unlawful discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e, *et seq.* and the Maryland Fair Employment Practices Act (MFEPA), Md. Code Ann., State Gov't § 20-606. He has also brought claims for: unpaid overtime compensation in violation of § 7 of the Fair Labor Standards Act ("FLSA"), 29 U.S.C.§ 201 *et seq.* and the Maryland Wage and Hour Law, Md. Code Ann. Labor and Employment Art. §§ 3-415(a), 3-420(a); unpaid wages in violation of the Maryland Wage Payment and Collection Law, Md. Code Ann. Labor and Employment Art. § 3-501(c)(2)(iv); unlawful race discrimination in programs receiving federal financial assistance in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d; and, racial discrimination in violation of the Civil Rights Act of 1870, as amended 42 U.S.C. § 1980 *et seq.*

1

Now pending is a motion for summary judgment filed by the City.  (ECF No. 13).  It is fully briefed, and no oral argument is necessary.  *See* Local Rule 105.6.  For the reasons set forth below, the motion is granted in part and denied in part.

## BACKGROUND

The relevant facts, drawn primarily from the complaint, are largely not in dispute.  When the parties allege different versions of the facts, it is noted below.

Lockley started working for the Town in September 2007.  He was initially employed as a "Crewman 2" who was primarily responsible for trash and yard waste removal.  On February 10, 2010 Lockley was promoted to Administrative Assistant.  Shortly after his promotion, Lockley spoke to the Town Administrator about his compensation.  Lockley sought higher compensation because, in his own words, "unlike the person who was the Administrative Assistant before me, I graduated high school, and I was making less than that person."  (Lockley Deposition, ECF No. 13-2, 39:15-17).  Lockley's pay was increased five months later at the start of the new fiscal year on July 1, 2010.  *Id.* at 40:8-10.

On July 1, 2012, Lockley was again promoted, this time to Supervisor of Operations. According to Lockley, "[e]ven prior to . . . [my] appointment as Supervisor of Operations/Assistant Director of Public Works . . . [I] gradually assumed an active role in the operations of the department, including supervision and direction of the Department and was active in preparing and presenting budgets for the Department."  (ECF No. 1 at ¶ 15).  According to Lockley, he was paid $17.99/hour in this role.  *Id.*  This was a $1/hour increase above his previous salary.  (Lockley Declaration, ECF No. 19-6 at ¶ 9).  The Town states that "[p]laintiff was given the title of Supervisor of Operations immediately, but his salary increase was to be

phased in over a period of two years." (EFC No. 13-1 at p. 9) (citing Deposition of Cheye Calvo, ECF No. 13-3, 39:14-19).

On July 19, 2012, the Director of Public Works, Joe Coleman, was placed on administrative leave. Lockley was then named Acting Director of Public Works. According to Lockley, "at that time and continuing to the present . . . [I] was not paid the minimum salary for that position." (ECF No. 1 at ¶ 16). Lockley claims that the compensation for the position was $33.59/hour, in addition to a vehicle and a gasoline card. *Id.* The minimum compensation for the position was $27.90/hour. *Id.*

Lockley sought to increase his pay on a number of occasions. On August 6, 2012, he sent an email to James Wilkinson.[1] The email requested that Lockley's compensation be increased commensurate with his new status as director. (ECF No. 13-4). Lockley also submitted a "payroll change notice" seeking to change his compensation from $17.99/hour to $33.59/hour. (ECF No. 13-5). In his email, Lockley explained that, following his last promotion, he was not given a pay raise for five months, and was not paid back pay, and he would therefore "prefer not to have the same situation occur again." (ECF No. 13-4). Wilkinson responded to the email and indicated to Lockley that he was "unaware of the delay and lack of back pay from your prior promotion."[2] *Id.* He also stated that $33.59 was the previous Director's "final rate" of pay, after holding the position "for many years" and that "we have to look at what the range is for Director

---

[1] Wilkinson is described by Lockley as the "Mayor Pro Tem." (ECF No. 1 at ¶ 19). The Town describes him as "the Town Council member in charge of the Department of Public Works." (ECF No. 13-1 at p. 10). He appears to have served in both roles.
[2] Lockley states in his complaint that he filed the "payroll change notice" on August 19, 2014, and that Wilkinson responded to his email on that day. (ECF No. 1 at ¶ 20). The "payroll change form" requests an effective date of August 19, 2012 (ECF No. 13-5) but the response email from Wilkinson is dated August 6, 2012. (ECF No. 13-4).

of PW before deciding where you belong on that scale on an annualized basis (i.e., salary); and then from there figure out the comparable hourly rate." *Id.*

On February 1, 2013, Lockley again contacted Wilkinson regarding his compensation.  In a memorandum, Lockley described his accomplishments within the Public Works Department over the past year.  (ECF No. 13-6).  He stated that "I'm still working for the initial salary of $37, 419.20 or $17.99 hourly," the rate "offered to me in July, 2012 when I was promoted to Supervisor of Operations."  *Id.*  Lockley indicated that this fell short of the "minimum salary requirements of the Supervisor of Operations position" (of $4,283.20 or $21.29 hourly) and asked to be paid the minimum for a director (of $58,032 or $27.90 hourly), including back pay for the six months since being appointed acting director.  *Id.*  In his complaint, Lockley alleges that he wrote this memorandum after learning that two of his Caucasian subordinates were being compensated more than he.  (ECF No. 1 at ¶ 21).

On February 13, 2013, Lockley met with Town official Wilkinson and the mayor, Cheye Clavo, to discuss his compensation.  Lockley was told that he would continue to serve as Acting Director for another year, but his compensation would not be adjusted.  According to the Town, Lockley was also told that in order to be promoted to Director, he was required to have a bachelor's degree in public or business administration, civil engineering or related studies, and/or relevant experience.  (ECF No. 13-1 at p. 12).  Lockley states that he was told to be promoted to permanent director "he should focus on additional professional development in the area of supervision and management and that he should consider obtaining a bachelor's degree."  (ECF No. 1 at ¶ 23).  Lockley maintains that these requirements were not in place previously, and that the prior director only had eight years of formal education.  *Id.*

During this meeting, Lockley also asked to receive higher compensation ($33.59/hour, the number he had indicated on his payroll change form) because he was currently serving two roles: as the administrative assistant/supervisor of operations and the acting director, both without any additional support staff.  Lockley's request was denied.  His request for an administrative assistant was also denied—the Town said that due to "budgetary constraints" he would not receive an assistant until the start of the next fiscal year.  (ECF No. 13-1 at p. 13).

In May 2013, Lockley had a conversation with Town Administrator Ed Murphy.  Murphy stated that at the start of the new fiscal year, on July 1, Lockley would be paid a base salary of $44,000 for serving as Supervisor of Operations, plus a $6,000 bonus for serving as the Acting Director.  (ECF No. 13-2, 66:12-20).  That month, Lockley received a $6,000 bonus for serving as Acting Director since June 2012.  *Id.* at 66:20-67:4.  He was told that he would not receive the bonus for the next fiscal year in a lump sum—instead it would incorporated into his bi-weekly paycheck.  *Id.* at 67:9-12.

After his February meeting, Lockley enrolled in a professional development program at Prince George's Community College ("PGCC") and in a bachelor's degree program at University of Maryland University College ("UMUC").  In June, Lockley emailed Wilkinson notifying him that he had completed the "courses of study required to earn a Continuing Education Certificate in Management and Supervision from Prince George's Community College."  (ECF No. 13-7).  This consisted of sixty total hours of classroom instruction in a variety of areas.  *Id.*  Lockley also indicated that he had completed his first semester at UMUC, had maintained a 4.0 GPA, and was halfway through his second semester.  *Id.*  Lockley stated in this email that he "plan[nned] to use the 90 hours of comp time I've earned while taking courses at PGCC after hours to take a vacation from Friday, June 28th through Monday, July 15th."  *Id.*

Wilkinson responded and congratulated Lockley on his successes. *Id.* He also stated that questions about reimbursement for the courses and compensation time would have to be referred to the Town Administrator, Murphy. *Id.* In his deposition, Lockley stated that the issue of compensation time for the courses was briefly discussed at the February meeting. (ECF No.13-2, 76:16-77:3). He said Mayor Clavo suggested he could earn vacation time for the hours he participated in training programs. *Id.* at 76:17-19. He also stated that Wilkinson said the decision regarding compensation time would be up to Murphy. *Id.* at 77:2-3. When Lockley eventually submitted his request for compensation time to Murphy, it was denied. *Id.* at 77:4-5. Lockley did participate in the Town's tuition reimbursement program and has received $3,000 towards the cost of his courses through this program. *Id.* at 77:12-78:1.

Lockley filed his charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on June 6, 2013. The charge alleges that he was subject to disparate pay practices on account of his race. (ECF No. 13-8). The Town claims in its opposition motion that "[t]he charge was not mailed to the Town until on or after July 5, 2013." (ECF No. 13-1 at p. 15).

On June 27, 2013 Murphy sent Lockley a memorandum confirming his compensation for the 2014 fiscal year. (ECF No. 13-9). It stated that as of July 1, 2013, Lockley would earn $44,345.60 ($24.21/hour) for his position as Supervisor of Operations, plus a $6,000 bonus for serving as Acting Director—a total of $50,356.80. *Id.* This was exclusive of a cost of living allowance ("COLA") or merit incentive increases. *Id.*

On July 3, 2013, Lockley received another memorandum indicating that there was "an error . . . in calculating your pay in your capacity as Acting Director of Public Works through the beginning of the current financial year." (ECF No. 13-10). The letter stated that because the

"current Personnel Manual calls for an employee who is temporarily assigned to an acting position with a higher pay range for at least one month . . . to be paid at the minimum of the higher pay range . . . you are owed $9,397.76 for the period July 19, 2012 through July 10." *Id.*

The letter also outlined that at a July 10, 2013 meeting, the Town Council planned to consider a change to this policy that would "give it greater discretion in setting compensation for an employee who serves as an Acting Department Director." *Id.* Based on this "new framework" the Town Council established that, effective July 1, Lockley would be entitled to $51,219.20 for the upcoming year. *Id.* The letter also stated that because the acting director position was managerial under the FLSA, Lockley would be ineligible for pay or compensatory time for overtime worked. *Id.* Lockley alleges that this letter was only sent "after Defendant received notice of Plaintiff's Charge of Discrimination." (ECF No. 1 at ¶ 29). The Town disputes this. (ECF No. 13-1 at p. 15).

On July 10, the Town Council passed Resolution No. 7-2013. (ECF No. 13-11). This altered the Town's compensation of acting employees as the July 3 letter indicated it would. *See id.* The resolution also classifies the position of Acting Department Director as an exempt position for FLSA purposes. *Id.* Additionally, while the previous law provided that an acting "temporary assignment" shall not exceed six months, the new resolution provided that an assignment could exceed six months if "extended with the approval of the Town Council." *Id.*

On September 12, 2013, Lockley amended his charge at the EEOC to include a claim for retaliation on the basis of Resolution No. 7-2013. (ECF No. 13-12). On October 8, 2013, he received his first performance review as Acting Director. Lockley's overall rating was a 3.57, on a five point scale, which is considered satisfactory. (ECF No. 13-13). Lockley was dissatisfied with this review, because he argues he had always been rated in an "exemplary manner" and this

was less favorable.  (ECF No. 1 at ¶¶ 32, 33).  His previous rankings were all above a 4.0, with the lowest score a 4.23.  (ECF No. 13-2, 79:14-17).  He again amended his EEOC charge on November 15, 2013 to include a retaliation charge for this performance review.  (ECF No. 13-14).  He also filed a grievance to appeal his performance evaluation and a hearing was held on the issue in January 2014.  *Id.* at 81:5-82:21.  As a result of the hearing, Lockley's rating was changed to 3.63.  *Id.* at 82:19.

On December 20, 2013 Lockley received a right to sue letter from the EEOC.  (ECF No. 13-15).  On June 23, 2014, the Town named Lockley permanent Director of the Department of Public Works.  (ECF No. 13-16).  His annual salary was increased to $59,169.80.  *Id.*

## STANDARD

Summary judgment is appropriate when the record shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P 56(a); *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986).  A genuine dispute about a material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When reviewing a motion for summary judgment, the court must look at the facts and inferences drawn from there in the light most favorable to the non-moving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

Although the moving party bears the burden to demonstrate the absence of any genuine issue of material fact, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970), the non-moving party may not merely rest upon allegations or denials in pleadings, but must, by affidavit or other evidentiary showing, set out specific facts showing a genuine issue remains for trial.  Fed. R.

Civ. P. 56(c)(1)(A).  A court should enter summary judgment where a non-moving party fails to make a sufficient showing to establish the elements essential to the party's claim and on which the party will bear the burden of proof at trial.  *See Celotex*, 477 U.S. at 322.

If there is insufficient evidence for a reasonable jury to render a verdict in favor of the non-moving party, there is no genuine issue of material fact, and summary judgment may be granted.  *See Anderson*, 477 U.S. at 248.  The court must not yield its obligation "to prevent factually unsupported claims and defenses from proceeding to trial."  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003).  Conversely, the motion should be denied if factual issues exist "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson*, 477 U.S. at 250.

## ANALYSIS

### I.     Discrimination under Title VII

#### a.   Applicable Law

Title VII prohibits employers from discriminating against an "individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race."  42 U.S.C. § 2000e-2(a)(1).  A plaintiff can meet his burden of proof through introducing direct or circumstantial evidence, or through the *McDonnell-Douglas* burden-shifting framework.  *See, e.g.*, *Foster v. Univ. of Maryland-Eastern Shore*, 787 F.3d 243, 249 (4th Cir. 2015) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  Here, Lockley relies on the *McDonnell Douglas* framework to oppose the Town's motion for summary judgment.

Under this framework, to establish a claim for disparate treatment, Lockley must establish that: 1) he is a member of a protected class; 2) he was a satisfactory performer; 3) he suffered an adverse employment action; and 4) similarly situated employees outside his protected

class received more favorable treatment.  The third and fourth prongs vary slightly depending on the type of claim of adverse action—e.g. compensation, promotion, or firing.  *See McDonnell Douglas*, 411 U.S. at 802 n.13.  The threshold plaintiffs must meet to establish a prima facie case is low, *see, e.g.*, *Blue v. U.S. Dep't of Army*, 914 F.2d 525, 536 (4th Cir. 1990), and doing so is "relatively easy." *Evans v. Technologies Applications & Serv. Co.,* 80 F.3d 954, 960 (4th Cir. 1996) (internal citation and quotation omitted).

   After the plaintiff establishes a prima facie case, the burden of production shifts to the employer, whom must proffer a legitimate, non-discriminatory rationale that explains the adverse employment action.  *See, e.g.*, *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010).  Once the employer cites that reason, the burden shifts back to the plaintiff who must prove by a preponderance of the evidence that the employer's proffered rationale is merely "a pretext for discrimination." *Id.* (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981)).  Apart from burden-shifting, however, the core question always remains "whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000).

   It is not disputed that Lockley is a member of a protected class and that he was satisfactorily performing his duties.  In his complaint, Lockley alleges several adverse employment actions, "including but not limited to, paying him less than similarly situated department heads not in his protected classification for performing similar work, failing to name him as Director and issuing him a negative appraisal." (ECF No. 1 at ¶ 49).  I address whether each of these allegations establishes a prima facie case, and if so, if the Town has provided a legitimate, non-discriminatory reason for the action.  Because the first two claims are closely related, I address them together.

### b. Compensation and Status as "Acting Director"

I find that Lockley has stated a prima facie case for the first two allegations: his failure to receive an increase in compensation after his promotion and his failure to be named "director," rather than "acting director" for a two-year period.

First, I find that these actions constitute an "adverse employment action."  As to compensation, Lockley is alleging that, even after he was promoted significantly, his pay was not increased.  Lockley was earning $16.99 when he was serving as a crewman, and $17.99 when he served in two roles as Supervisor of Operations and Administrative Assistant.  When he then became director of the entire department, his salary was not changed.  This mismatch between the promotion—which included a significant increase in job duties and responsibilities—and salary, which remained stagnant, is an action that "adversely affect[ed] the terms, conditions, or benefits" of Lockley's employment.  *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004) (internal citation omitted).

Lockley's status as an Acting Director for the two-year period had a similar "adverse effect."  Lockley claims that the Town maintained his status as "acting" in an effort to pay him less, and that this was done in violation of the town's personnel manual—which explicitly provided that individuals could serve as "acting directors" for no more than six months.  Keeping Lockley in this position, against policy, had a "detrimental effect" on his "compensation, job title . . . [and] opportunity for promotion."  *Id.* at 376.

The Town argues strenuously that Lockley has not satisfied the prong's fourth test—and shown that similarly situated members outside of Lockley's protected class received preferential treatment.  The Town attacks the two individuals Lockley identifies as comparators—his predecessor in office, Joe Coleman, and the Chief of Police for the Town, Kenneth Antolik.

Lockley highlights that Coleman was paid $33.59/hour, significantly more than Lockley's salary, prior to when Coleman was placed on administrative leave.  Lockley also compares himself to Antolik, an Asian male, and points out that when Antolik became a Department Head, he was not required to serve in an "acting" capacity for any period, and was compensated at the level as the departing Chief of Police.  (ECF No. 19-1 at p. 20).  The Town argues that these comparators did not share with Lockley "substantially similar experience, education, duties, and qualifications," *Romeo v. APS Healthcare Bethesda, Inc.*, 876 F. Supp.2d 577, 592 (D. Md. 2012) and, particularly for with respect to Antolik, did not "deal[] with the same supervisor, w[][as] [not] subject to the same standards and . . .[did not] engage[] in the same conduct." *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) (per curiam).

I decline to adopt the Town's reasoning.  As his direct predecessor in the identical job, particularly for purposes of compensation, Coleman can be a valid comparator.  *See Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 343 (4th Cir. 1994) (holding that for purposes of comparators under the Equal Pay Act, "[a] plaintiff may make her *prima facie* case by comparing her salary to that of her predecessor or successor").  As to Antolik, it is a more difficult question. Antolik, like Lockley, also lacks a college degree, and, as heads of different municipal departments they share some similar responsibilities. On the other hand, Antolik also had significantly more experience in his field before starting in his position, and Lockley and Antolik are heads of vastly different departments—public works and policing. The crux of Lockley's comparison, however, turns on the circumstances surrounding his and Antolik's initial hiring, and the fact that Antolik was not required to serve as an "acting" directing for a significant period.  Given this, and the flexibility this Circuit has embraced with respect to establishing a prima facie case, I find Lockley has stated a claim for disparate treatment for this claim.  *See*

*Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 780 (D. Md. 2010) ("Moreover, the Fourth Circuit has cautioned that "*McDonnell Douglas*' prima facie case requirements are 'not necessarily applicable in every respect to differing factual situations.'" (quoting *Miles v. Dell, Inc.,* 429 F.3d 480, 487 (4th Cir.2005)).[3]

Given this finding, the burden shifts to the Town to offer a legitimate non-discriminatory reason for these actions.  They have done so.  According to the Town, Lockley's salary was not increased, or his title updated, because he was not fully qualified for the Director position.  The Town cites the Director of Public Works Job Description, which requires that a director hold a "bachelor's degree in public or business administration, civil engineering or in related studies" and provides that "a combination of education or relevant experience may be substituted for the above."  (ECF No. 23-2).  The Town reasons that its decision was based on the fact that Lockley "did not have the requisite education requirements or years of experience which could be used in lieu of a college education."   (ECF No. 13-1 at p. 24).  Mainly, although Lockley had been employed by the Town since 2007, he only served in a supervisory role for a short period prior to his appointment to the role of Acting Director, and he only had a high-school education.  Lockley also testified that the Town indicated it could not raise his pay due to budgetary constraints.  (ECF No. 13-2, 88:9-17).

As a result of the Town's proffer of these reasons, the burden shifts back to Lockley, who must show that the Town's reasoning is a pretext.  Lockley has offered sufficient evidence for a reasonable jury to find that the Town's stated reasons were such.

___

[3] This is also particularly true, where like here, it is arguable that there is an exactly similarly-situated worker to whom to compare Lockley.  *See Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2nd Cir. 2001)

One, Lockley has pointed out that in keeping Lockley in his position as Acting Director for two years, the Town was violating its own policies.  The Town Personnel Manuel stated that a person could only serve in an "acting" capacity for a period of six months.  (ECF No. 19-5 at p. 4).  Lockley clearly violated this by staying in his position for two years.  The Town, in its memoranda, emphasizes that the personnel manual is not a binding contract between the parties and therefore, the Town is not required to abide by it.  (ECF No. 22 at p. 3).[4]  Even assuming this is true, this does not diminish the fact that the Town's violation of its own regulations can have probative value when a plaintiff seeks to show pretext.  *See Blasic v. Chugach Support Servs., Inc.*, 673 F. Supp. 2d 389, 399 (D. Md. 2009) (finding that an employer's failure to follow its own internal procedures, or inconsistent application of its procedures, could be evidence of pretext).  It also does not explain why, if the Town is unconcerned with the regulations it has set forth, it specifically changed the manual one year into Lockley's service, in order to allow a person to serve in an acting capacity for more than one year.  (ECF No. 13-11).

Lockley makes a parallel showing with the Town's pay scales he offers in support of his theory.  He highlights that he was consistently paid below the minimum wage for his position. (ECF No. 19-7 at p. 2).  The range for a Supervisor of Operations was $21.29–$29.36 an hour; the range for Public Works Director was $27.90–$38.48 an hour.  *Id.*  Lockley was paid $17.99/hour when he held both of these positions.  He seeks to undermine the Town's explanation for the disparity by highlighting that the Town was consistently paying him below

---

[4] Specifically, the Town argues that "[u]nder Maryland law, Personnel Manuals are not a contract where, as here, the Personnel Manual contains a clear disclaimer."  (ECF No. 13-1 at p. 18) (citing *Castiglione v. Johns Hopkins Hospital*, 69 Md. App. 325, 517 A.2d 786 (1986), *cert. denied*, 309 Md.  *See also* (ECF No. 22 at p. 3) (citing cases that holding that a personnel handbook may not be an enforceable covenant).  This argument misses the mark—Lockley is not suing the Town for breach of the personnel manual.  Rather, he is relying on the personnel manual, and the fact that the Town did not follow its commands, to show pretext.

the required pay guidelines that the Town itself established.  Courts in this District have found

that for an employer's violation of its internal policies to be evidence of pretext, "the violation

must be material and significant."  *Noshafagh v. Leggett,* Civ. 11-3038, 2013 WL 93345, at *10

(D. Md. Jan. 7, 2013) *aff'd,* 538 F. App'x 251 (4th Cir. 2013) *cert. denied,* 134 S. Ct. 1004, 187

L. Ed. 2d 851 (2014) (internal quotation and citation omitted).  I find that the gap between

Lockley's pay and the pay scales meets this threshold.

Third, Lockley points to the job description for the Public Works position proffered by

the Town—which provides that a candidate must have a college degree—as evidence of pretext.

(ECF No. 23-2).  Lockley argues that this description was created in December 2012 (ECF No.

19-1 at p. 8), after he was appointed Acting Director and serving in the role for several months, a

fact that the Town does not confirm or deny.  Lockley also argues that this conflicted with the

Town's prior policy, because his predecessor Coleman, only had an eight grade education.  (ECF

No. 19-6 at ¶ 25).  Lockley's theory is that the Town created the job description, after already

giving him the Acting position, in an attempt to prevent him from earning more while he served.

Together, these allegations at least highlight inconsistency on the part of the Town.  On

one hand, the Town told Lockley he could not be paid more because he lacked experience, but

the "experience" requirement was not passed until after he already was serving in the acting

director position.  As to its policies, the Town takes opposing positions regarding their force

depending on which policy is at issue—the job description was binding, but the guidelines for

compensation are not.  Furthermore, the Town permitted Lockley to serve in an "acting" capacity

for one year, but then determined that, in order to keep him in that role for another year, they

should change the personnel manual.  Now, in their motions, they argue that these regulations are

not strictly enforceable.  Accordingly, I find that Lockley has raised an inference concerning the

Town's motivations in keeping him in the "acting" position on a low salary for two years.  A genuine dispute of material fact exists and summary judgment is denied.

### c.   Negative Performance Review

Lockley also alleges that he can make a claim for disparate treatment based on his first review as Acting Director, in which he received a lower score than previous reviews.  The Town offers evidence to show the review was not particularly negative, and that it had particular reasons for giving Lockley lower scores in certain areas.  (ECF No.13-3, 145:3-146:14).  On one particular issue, Lockley sought a hearing on his score, and it was increased after review by the town council.  Perhaps most significantly, as the Town points out, the review did not prevent Lockley from eventually becoming the Director.

I find the review was not an "adverse employment action" for purposes of Title VII liability.  The Fourth Circuit has held that a "downgrade of a performance evaluation *could* effect a term, condition, or benefit of employment if it has a tangible effect on the terms or conditions of employment."  *James*, 368 F.3d at 377 (internal citations omitted).  This is qualified, however, in that a "poor performance evaluation is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment. . . . An evaluation merely causing a loss of prestige or status is not actionable." *Id.* (internal citation omitted).  Here, Lockley argues that, as a result of the lower performance evaluation, he was not eligible for an annual raise, that only those employees with high performance evaluations are able to receive.  This only shows that the review prevented Lockley from receiving an additional benefit, not how or why the review "detrimentally alter[ed] the terms or conditions of his employment."    His pay was not reduced, nor were his responsibilities altered following the review.  The review also did not affect his status—Lockley maintained his

position as Acting Director following the review, and was, approximately nine months later, promoted to the Director position. Accordingly, I find that the performance review was not an adverse employment action, and grant the Town's motion for summary judgment on this claim.

## II. Retaliation under Title VII

### a. Applicable Law

A plaintiff alleging retaliation in violation of Title VII must prove that he: (1) engaged in protected activity; (2) suffered a materially adverse employment action from his employer; and (3) there is a causal connection between the two. *See, e.g.*, *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007).

Of particular relevance here is the third element: a causal connection between the protected activity and the adverse action. Temporal proximity is one method by which a plaintiff can prove this element. Obviously the closer in time between the protected activity and adverse action, the stronger the inference of causality. *See, e.g.*, *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001). The Fourth Circuit has held, however, that a duration of even three to four months was too long to establish causation when it was the only evidence of causation. *Pascual v. Lowe's Home Ctrs. Inc.*, 193 F. App'x 229, 233–34 (4th Cir. 2006). *But see King v. Rumsfeld*, 328 F.3d 145, 151 & n.5 (4th Cir. 2003) (holding that while a two-and-a-half month gap "weaken[s] significantly the inference of causation," it did not preclude the plaintiff from proving causation). If the plaintiff cites additional evidence of causation, however, a longer temporal duration does not necessarily defeat plaintiff's claim. *See, e.g.*, *Jenkins v. Gaylord Entm't Co.*, 840 F. Supp. 2d 873, 881 (D. Md. 2012) ("To be sure, plaintiffs may state a prima facie case of causation by relying on evidence other than, or in addition to, temporal proximity where such evidence is probative of causation."); *see also Lettieri v. Equant, Inc.*, 478 F.3d 640,

650 (4th Cir. 2007) ("Specifically, evidence of recurring retaliatory animus during the intervening period can be sufficient to satisfy the element of causation.").

Finally, in contrast to racial discrimination claims, which permit a plaintiff to recover even when the employer's motivation included both lawful rationales and unlawful discrimination, a plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action [retaliation] by the employer." *Univ. of Tx. Southwestern Med. Cntr. v. Nassar*, 133 S. Ct. 2517, 2532–33 (2013). The *Nassar* court, however, addressed a plaintiff proffering direct evidence of retaliation—the case did not fall within the *McDonnell Douglas* framework. *Foster*, 787 F.3d at 250–52. After reviewing the purpose and elements of that framework, the Fourth Circuit held that because a plaintiff has always had to demonstrate "at the pretext stage that retaliation was a but-for cause of a challenged adverse employment action," *id.* at 252, *Nassar* did "not alter the legal standard for adjudicating a *McDonnell Douglas* retaliation claim." *Id.*

There is no dispute that by filing his initial EEOC charge in June 2013 Lockley engaged in a "protected activity." Lockley alleges that both his negative performance review in October 2013 and the Town's passage of Resolution 7-2013 were retaliatory.

### b. Negative Performance Review

Lockley correctly points out that in determining what constitutes a materially adverse employment action, "adversity for the purposes of Title VII's sex and race discrimination proscription is a higher standard than adversity within the meaning of Title VII's retaliation provision." *Westmoreland v. Prince George's Cnty., Md.*, 876 F. Supp. 2d 594, 605 (D. Md. 2012) (citing *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 61–67 (2006). The inquiry for retaliation claims is whether the action would "have dissuaded a reasonable

worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 60 (internal quotation marks omitted).

Even considering the negative review in light of this less-arduous standard, I still find it does not constitute an adverse employment action on the grounds that Lockley has not shown any significant consequences of the review.  The Town considered the review to be satisfactory, and eventually promoted Lockley following the review.  The sole fact that Lockley was not eligible for a small raise only available to the most highly-reviewed employees does not make the review actionable.  I find this holding consistent with the conclusions of other courts who have considered similar questions.  *See Wonasue v. Univ. of Maryland Alumni Ass'n*, 984 F. Supp. 2d 480, 492 (D. Md. 2013) ("Even with this lower bar, none of the following constitutes an adverse employment action in a retaliation claim: failing to issue a performance appraisal; moving an employee to an inferior office or eliminating the employee's work station; considering the employee 'AWOL'; or issuing a personal improvement plan, 'an Attendance Warning,' a verbal reprimand, 'a formal letter of reprimand,' or 'a proposed termination.'" (citing *Rock v. McHugh,* 819 F. Supp. 2d 456, 470–71 (D.Md.2011)).

### c.  Resolution 7-2013

On his claim that the Town retaliated against him with the passage of Resolution 7-2013, I find that Lockley has stated a prima facie case.  First, a reasonable jury could find the passage of Resolution 7-2013 was an adverse employment action that would "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 60 (internal quotation marks omitted).   The Resolution specifically affected Lockley's employment with the Town in two ways: one, it allowed the Town to maintain his status as Acting Director for as long as the Town determined appropriate; and two, it enabled the Town to determine his

19

level of compensation as Acting Director.  (ECF No. 13-11).  In short, the Resolution changed Town policy to allow Lockley to work at a lower rate for a longer period of time.

Second, Lockley has also established the third element of a retaliation claim—a causal relationship between his protected activity and the retaliation.  Importantly, Lockley has shown temporal proximity.  Lockley filed his charge with the EEOC on June 6, 2013.  The Town Council passed the Resolution on July 10, 2013, shortly thereafter.  The Town makes an unsubstantiated claim that Lockley's EEOC charge was not mailed to the Town until on or after July 5, 2013.  (ECF No. 13-1 at p. 36).  Mayor Calvo stated at his deposition, however, that he was made aware of Lockley's EEOC filing sometime in June.  (ECF No. 19-8 at 124:8-125:5). In its reply, the Town also concedes this.  (ECF No. 22 at p. 11).  It appears then, that there were only a few weeks between the time of Lockley's filing and the Town's decision to draft, and then pass, the Resolution. Given the close proximity between these events, causality is a reasonable inference. [5]

The Town has attempted to offer legitimate reasons for the passage of Resolution 7-2013. The Town cites Mayor Calvo's deposition where he testified that the Resolution was passed to give the Town Council more flexibility in setting compensation for temporary employees and to give employees in temporary positions the opportunity to decline those positions without recourse.  (ECF No. 13-1 at p. 35) (citing 13-3 at 77:14-17, 79:10-80:9).  The Town also

---

[5] The Town emphasizes that after receiving word of Lockley's EEOC charge, Town Administrator Murphy looked at the Personnel Manual and "realized that a mistake had been made in administering Plaintiff's salary."  (ECF No. 22 at p. 11).  The Town then paid Lockley a lump sum to make up for the period July 19, 2012 to July 10, 2013, when Lockley was underpaid.  *Id.*  This fact does not alter the Town's next decision—to pass a Resolution changing the manual, so that the Town could continue to keep Lockley in the position of Acting Director and not have to increase his salary.

emphasizes that the Resolution applied to all Directors, not just the Director of Public Works position.

Lockley disputes the characterization of the Resolution as broad-reaching, and claims that he was the only employee affected by its passage.  Because Lockley was the only department head serving in an "acting" capacity, he infers that the Resolution was aimed squarely at him. He also argues that the reasons are pre-textual because they represent a stark break with prior Town policy—specifically, the Town's prior practice of treating department heads as non-exempt employees, (ECF No. 19-1 at p. 32), as well as the Town's policy of only giving temporary assignments for a maximum of six months.

I find that, again, Lockley has at least raised an inference concerning the Town's stated reasons for its actions.  He has pointed to "weaknesses, implausibilities, or inconsistencies" such that a fact-finder could find the Town's explanation "unworthy of credence."  *Darvishian v. Geren*, 404 F. App'x 822, 831 (4th Cir. 2010) (per curiam) (internal citation omitted).  Because he has done so, the question of the Town's motivations becomes a jury question.  Accordingly, the Town's motion for summary judgment on this claim is denied.

## III.    Additional Claims

### a.  MFEPA

Counts III and IV of Lockley's complaint allege violations of portions of the MFEPA. These claims mirror Lockley's claims under Title VII.  Because MFEPA claims are analyzed under the same framework as Title VII claims, *Wise v. Gallagher Basset Servs., Inc.*, 228 F. Supp. 2d 671, 674 (D. Md. 2002), I reach the same conclusions with respect to these claims as I did to the Title VII claims.  Accordingly, the Town's motion for summary judgment on the

claims stemming from the performance review is granted.  The motion for summary judgment on all other claims is denied.

### b.  Overtime Claims

Lockley brings claims for overtime under three separate statutes: § 7 of the FLSA (count V), 29 U.S.C. § 207; the Maryland Wage and Hour Law ("MWHL") (count VI), Md. Code Ann. Labor and Employment Art. §§ 3-415(a), 3-420(a); and the Maryland Wage Payment and Collection Law ("MWPCL")(count VII), Md. Code Ann. Labor and Employment Art. § 3-501(c)(2)(iv).  Both the FLSA and MWHL exempt employees working in a "bona fide executive, administrative or professional capacity" from overtime requirements 29 U.S.C. § 213 (a)(1); Md. Code Ann., Lab & Empl. Art. § 3-403.[6]  The Town moves for summary judgment on the grounds that after his promotion to Acting Director, Lockley was an exempt employee.

> The Secretary of Labor has set forth a three-part test for the administrative exemption:
>
> "(1) [T]he employee must be compensated at a salary rate of not less than $455 per week; (2) the employee's primary duty must consist of "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers"; and (3) the employee's primary duty must "include[] the exercise of discretion and independent judgment with respect to matters of significance."
> *Desmond v. PNGI Charles Town Gaming, L.L.C.,* 564 F.3d 688, 691 (4th Cir. 2009) (citing 29 C.F.R. § 541.200 (2009)).

The Town has the burden of proving Lockley's exempt status by "clear and convincing evidence.

*Id.*  (citing *Shockley v. City of Newport News*, 997 F.2d 1, 21 (4th Cir. 1993).

Lockley does not appear to dispute that his duties qualify him for the exemption— Lockley was clearly managing—in his role as Acting Director he was overseeing a department of

---

[6] "'Administrative capacity' has the same meaning under the regulations governing the MWHL as it does under the FLSA regulations.  Thus, an employee who qualifies for the administrative exemption under the FLSA also will qualify for that exemption under the MWHL." *Lane v. Sys. Application & Technologies, Inc.,* Civ. DKC 13-3566, 2015 WL 1013449, at *6 (D. Md. Mar. 6, 2015) (citing Md.Code Regs. 09.12.41.01).

seven employees.  He instead focuses his argument on the salaried requirement, contending that

because his pay was docked for absences of less than one day, he is not salaried.  *See Shockley*,

997 F.2d at 22 (holding that deductions in pay for part-day absences "defeat any claim that the

employee was paid on a salary basis").

In response, the Town points to another regulation concerning public employees, which

provides that they will not lose their exempt status, if they are:

> [P]aid according to a pay system established by statute, ordinance or regulation, or by a
> policy or practice established pursuant to principles of public accountability, under which
> the employee accrues personal leave and sick leave and which requires the public agency
> employee's pay to be reduced or such employee to be placed on leave without pay for
> absences for personal reasons or because of illness or injury of less than one work-day
> when accrued leave is not used by an employee because:
>> (1) Permission for its use has not been sought or has been sought and denied;
>> (2) Accrued leave has been exhausted; or
>> (3) The employee chooses to use leave without pay.
>
> 29 C.F.R. § 541.710

According to the Town, because it only reduces salaries for partial day absences on the

bases outlined in the exemption, Lockley does not lose his status as an exempt employee.  (ECF

No. 22 at pp. 18–19).  Specifically, the Town cites its "long standing policy of docking the pay

of employees who took part-day absences without using leave" and its Personnel Manuel, which

provides that employees who have an "unauthorized absence" for a portion of a day may lose

pay. *See id.*

I agree with the Town.  The Town has indicated that Lockley was a salaried employee,

and that most of his duties involve management.  The instances where the Town reduced his

salary meet the exemption for public employees outlined above, and do not disqualify Lockley

from salaried status.  He therefore qualifies for the bona fide executive exemption, and is not

entitled to overtime.  Accordingly, I grant summary judgment on Lockley's claim for overtime

under the FLSA and the MWHL.

I also grant the Town's motion for summary judgment on the MWPCL claim.  Although the Town is incorrect in arguing that the MWPCL does not apply to overtime claims, *see Butler v. DirectSAT USA, LLC*, 307 F.R.D. 445, 450 (D. Md. 2015) (noting that the "2010 Amendment to the MWPCL . . . added 'overtime wages' to the statute's definition of wages" for clarification purposes), the MWPCL does not permit recovery here.  It, and the MWHL, provide plaintiffs with "two avenues" to "recover *unlawfully* withheld wages from their employer." *Peters v. Early Healthcare Giver, Inc.*, 439 Md. 646, 97 A.3d 621, 625 (2014) (emphasis added).  Here, as is clear from above, Lockley was not entitled to overtime pay because he was an "exempt" employee.  As a result, such wages were not unlawfully withheld.

### c.  Title VI

Count VIII of Lockley's complaint alleges a violation of Title VI of the Civil Rights Act of 1964.  Title VI bars discrimination on the basis of race, color, or national origin in any "program or activity receiving federal financial assistance." 42 U.S.C. § 2000d.  In his complaint, Lockley states that the Town received federal financial assistance from the United States Department of Transportation, which was channeled to it through the Maryland Department of Transportation, and thus is subject to Title VI.  (ECF No. 1 at ¶ 99).

Title VI contains an important limitation—an action can only be brought against an employer where "a primary objective of the Federal financial assistance is to provide employment." 42 U.S.C. § 2000d-3.  This prevents Title VI from being "transformed into an avenue for pursuing all employment discrimination claims." *Rogers v. Bd. of Educ. of Prince George's Cnty.*, 859 F. Supp. 2d 742, 747 (D. Md. 2012).  To succeed, a plaintiff must show a "logical nexus between the alleged discriminatory practices targeted by agency action and the use of federal funds—i.e., both must relate to employment. *Id.* (internal citations omitted).

24

Although in his complaint Lockley states that the funds received by the Town had the "primary objective" of "providing employment" he offers no evidence to support this claim. Indeed, Lockley has not offered any evidence to even support the claim that the Town received federal funds, nor has he responded to the Town's motion for summary judgment on this claim. Without any evidence to support Lockley's assertion, I grant the Town's motion for summary judgment. *See id.* at 749 (collecting cases holding same).

### d.   42 U.S.C. § 1981

In Count IX of the complaint, Lockley alleges that the Town violated 42 U.S.C. § 1981. (ECF No. 1 at ¶¶ 108–14).  Section 1981 bars discrimination on the basis of race in the making and enforcement of contracts.  The statute applies to at-will employment contracts, like the one here. *Spriggs v. Diamond Auto Glass*, 165 F.3d 1015, 1018–19 (4th Cir. 1999).  The parties agree that, "in the employment context, the elements of a claim under section 1981 are largely the same as those for a claim of race discrimination under Title VII," *Callwood v. Dave & Buster's, Inc.*, 98 F. Supp. 2d 694, 704 (D. Md. 2000), and consequentially rely on their arguments in the context of Title VII to support their arguments with respect to § 1981. Accordingly, I reach the same conclusions I did above, and grant the Town's motion for summary judgment only on the claims stemming from the negative performance review.  *See also Mallory v. Booth Refrigeration Supply Co.,* 882 F.2d 908, 910 (4th Cir. 1989) (holding that "the framework of proof for disparate treatment claims—that is, whether the employer intentionally discriminated against the employee—is the same for actions brought under Title VII or § 1981").

**CONCLUSION**

For the foregoing reasons, the Town's motion for summary judgment (ECF No. 13) is granted in part and denied in part.  The motion is granted with respect to the claims that stem from the performance review under Title VII, the MFEPA, and 42 U.S.C. § 1981, the claims seeking overtime pay, and the Title VI claim.  The motion is denied with respect to all other claims.  A separate order follows.


_____09/11/2015_____                    _____/s/_____
Date                                                                      J. Frederick Motz
                                                                              United States District Judge

26